## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ANTHONY MICHAEL LEE, as Administrator of the Estate of ASHLEY VIRGINIA HERNANDEZ, Deceased | : |
| | : |
| Plaintiff, | : |
| v. | : |
| | : Civil Action No. <u>4:26-CV-00104</u> |
| COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA DEPARTMENT OF CORRECTIONS, SUPERINTENDENT WENDY NICHOLAS, JOHN DOE CORRECTIONAL OFFICERS 1-10, JOHN DOE MENTAL HEALTH STAFF 1-5, and JOHN DOE MEDICAL PROVIDERS 1-5, | : JURY TRIAL DEMANDED |
| | : |
| Defendants. | : |

## <u>COMPLAINT</u>

Plaintiff Anthony Michael Lee, as Administrator of the Estate of Ashley Virginia Hernandez, deceased, by and through his undersigned counsel, brings this civil action based upon the personal knowledge of Plaintiff and based upon the investigation of counsel, against Defendants COMMONWEALTH OF PENNSYLVANIA, PENNSYLVANIA DEPARTMENT OF CORRECTIONS ("PA DOC"), WENDY NICHOLAS ("Nicholas"), in her official capacity as Superintendent of SCI Muncy, JOHN DOE CORRECTIONAL OFFICERS 1–10 ("Correctional Defendants"), in their individual capacities, JOHN DOE MENTAL HEALTH STAFF 1–5 ("Mental Health Defendants"), in their individual capacities, and JOHN DOE MEDICAL PROVIDERS 1–5 ("Medical Defendants"), in their individual capacities (collectively "Defendants" and each a "Defendant"). In support of this Complaint, Plaintiff states as follows:

1.      This case arises from egregious violations of Ashley Hernandez's constitutional rights, including the denial of medical and mental health care. While incarcerated at SCI Muncy, Ashley died by suicide due to critical failures by the Defendants. Their misconduct, compounded by systemic dysfunction within SCI Muncy and the Pennsylvania Department of Corrections, directly caused her death and inflicted lasting harm on her family, including her two young children.

## I.      PARTIES

2.      Plaintiff Anthony Michael Lee is an adult individual residing at 402 Main Street in Pottsville, Pennsylvania. He is the duly appointed Administrator of the Estate of Ashley Virginia Hernandez, deceased, pursuant to Letters of Administration issued by the Schuylkill County Register of Wills on February 14, 2025, under Estate No. 5425-0125.

3.      Decedent Ashley Virginia Hernandez (DOB: July 21, 1998) was a 25-year-old woman and a pretrial detainee housed at the State Correctional Institution Muncy ("SCI Muncy") located at 6454 State Route 405, Muncy, PA 17756, in Lycoming County, Pennsylvania.[1] She died on May 15, 2024, after being found hanging in her cell on April 9, 2024.

4.      Defendant Commonwealth of Pennsylvania is a sovereign entity and political subdivision of the United States responsible for operating correctional institutions and ensuring constitutional compliance by its agents and agencies. The Commonwealth oversees the Pennsylvania Department of Corrections and may be served at the Office of the Attorney General, Strawberry Square, Harrisburg, PA 17120.

---

[1] SCI Muncy is a correctional facility for women operated by PA DOC in Lycoming County, Pennsylvania. At all relevant times, SCI Muncy housed pretrial detainees and sentenced inmates, including Ashley Hernandez.

5.      Defendant Pennsylvania Department of Corrections ("PA DOC") is a department of the Commonwealth charged with operating and managing Pennsylvania's correctional facilities. At all relevant times, PA DOC acted under color of state law and had legal custody and supervisory responsibility for Ashley Hernandez, including through its operation of SCI Muncy.

6.      Defendant Wendy Nicholas is the Superintendent of SCI Muncy and, at all relevant times, was responsible for the overall management, administration, and supervision of staff and inmates at SCI Muncy. She is sued in her official and individual capacities.

7.      Defendants John Doe Correctional Officers 1–10 ("Correctional Defendants") are currently unknown individuals employed at SCI Muncy who, at all relevant times, were responsible for conducting rounds, supervising inmates, and responding to medical or mental health crises. These Defendants were acting under color of state law and are sued in their individual capacities.

8.      Defendants John Doe Mental Health Staff 1–5 ("Mental Health Defendants") are currently unknown individuals employed by or under contract with PA DOC who were responsible for evaluating, treating, or monitoring Ashley Hernandez's mental health at SCI Muncy. These Defendants were acting under color of state law and are sued in their individual capacities.

9.      Defendants John Doe Medical Providers 1–5 ("Medical Defendants") are currently unknown individuals employed by or under contract with PA DOC who were responsible for Ashley Hernandez's physical care and wellbeing. These Defendants were acting under color of state law and are sued in their individual capacities.

10.     At all relevant times, the Correctional, Mental Health, and Medical Defendants acted individually and jointly, under color of state law and within the scope of their employment.

3

They failed to monitor Ashley's mental health, respond to her deterioration, or take steps to prevent her death.

11.     Defendants Commonwealth of Pennsylvania, PA DOC, SCI Muncy, Nicholas, and the John Doe Correctional, Mental Health, and Medical Defendants are collectively referred to herein as the "DOC Defendants."

## II.    JURISDICTION AND VENUE

12.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     Venue is proper in the Middle District of Pennsylvania under 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to the claims occurred in Lycoming County, Pennsylvania, within this District.

## III.   GENERAL ALLEGATIONS

### A.    DOC Requirements for Screening, Classification, and Housing

14.     Pennsylvania Department of Corrections Policy 11.02.01 ("Reception and Classification") governs the intake, screening, classification, and housing of individuals entering DOC custody.[2]

15.     At initial reception, staff must use the Diagnostic-Classification Report Reception Checklist (DC-2A) to identify and document any history of mental illness, suicidal ideation, or behavioral health concerns.

---

[2] Pennsylvania Department of Corrections, Policy Statement 11.2.1, Reception and Classification (June 19, 2023), https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/about-us/doc-policies/11.02.01%20Reception%20and%20Classification.pdf (last accessed, January 13, 2026).

16.     The policy requires medical staff to perform a mental health screening at intake. If concerns are identified, immediate referral to the psychology department is mandatory.

17.     Classification and housing decisions must account for suicide risk, psychiatric needs, and vulnerability to victimization. This includes assessment for protective custody and Z-Code placement.

18.     Z-Code classification requires a mental health evaluation, suicide risk assessment, and review of prior records. Psychology staff must complete a Special Psychological Assessment and provide a housing recommendation.

19.     Inmates housed alone, including those assigned Z-Code or placed in isolation, must be monitored at adjusted supervision levels to account for increased suicide risk. Staff must conduct security rounds at intervals consistent with the inmate's classification, including 15-minute checks for those at risk of self-harm.

20.     Failure to conduct screening, initiate referrals, complete risk assessments, classify housing appropriately, or conduct required rounds constitutes a violation of Policy 11.02.01.

**B.     <u>DOC Standards for Mental Health Care</u>**

21.     DOC Policy 13.08.01 ("Access to Mental Health Care") establishes mandatory procedures for mental health screening, evaluation, crisis response, treatment, and placement.[3]

22.     All inmates must be screened at intake and provided appropriate diagnostic evaluations, including psychometric testing and clinical interviews, to assess emotional stability and treatment needs.

---

[3] Pennsylvania Department of Corrections, Policy Statement 13.08.01, Access to Mental Health Care (January 10, 2022), https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/about-us/doc-policies/13.08.01-access-to-mental-health-care.pdf. (last accessed, January 13, 2026).

23.     Inmates presenting with signs of psychiatric illness or deterioration must be referred for further evaluation and, if needed, placed in licensed mental health units, inpatient facilities, or designated specialized housing, including Secure Residential Treatment Units (SRTUs) and Special Observation and Assessment Units (SOAUs).

24.     Individuals diagnosed with serious mental illness must receive an Individual Recovery Plan (IRP) within 20 days, outlining treatment goals, identified risks, and necessary interventions.

25.     DOC must ensure that inmates with mental health needs are continuously tracked through the Mental Health/Intellectual Disability (MH/ID) system to maintain continuity of care across custody levels.

26.     Services must include outpatient and inpatient treatment, crisis intervention, and preventive care, and must be accessible throughout incarceration.

27.     Placement in specialized mental health housing is mandatory when an inmate's condition exceeds the resources of general population housing.

28.     These requirements impose non-discretionary duties on DOC to evaluate, treat, and house inmates with mental illness in accordance with recognized clinical and constitutional standards.

**C.    DOC Responsibilities to Accommodate Inmate Disabilities**

29.     Pennsylvania Department of Corrections Policy DC-ADM 006 ("Reasonable Accommodations for Inmates with Disabilities") sets forth mandatory procedures for identifying

and accommodating inmates with disabilities that substantially limit one or more major life activities, including mental and emotional conditions. [4]

30.     Qualified health staff must screen all inmates for disabilities within 14 days of commitment, determine necessary accommodations, and ensure implementation across housing, programming, medical care, and disciplinary procedures.

31.     Inmates diagnosed with disabilities may be assigned to Mental Health Units (MHUs) or other specialized housing based on clinical need.

32.     Accommodation requests may be initiated by DOC staff or submitted by inmates. While family members cannot file formal requests, staff must consider disability-related information from family members and act accordingly.

33.     Reports from family members about an inmate's history of suicide attempts, psychiatric hospitalization, or mental illness must trigger internal referral and evaluation procedures under the policy.

34.     DOC must coordinate accommodations through designated personnel, ensure interdepartmental communication, and document all disability-related actions.

35.     These obligations are non-discretionary and apply to all inmates with qualifying disabilities, as defined by federal law and DOC policy.

---

[4] Pennsylvania Department of Corrections, Policy Statement DC-ADM 006, Reasonable Accommodations for Inmates with Disabilities (January 2, 2009), https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/about-us/doc-policies/006%20Reasonable%20Accommodations%20for%20Inmates%20with%20Disabilities.pdf. (last accessed, January 13, 2026).

## IV.    FACTUAL BACKGROUND

36.    Ashley Virginia Hernandez was born on July 21, 1998. She was a 25-year-old mother of two young children, P.J.H.L. (DOB: April 9, 2020) and C.M.H. (DOB: November 28, 2021), at the time of her death.

37.    Ashley had a well-documented history of serious mental illness, trauma, and neurological disorders dating back to childhood. She was first hospitalized for psychiatric care at age 11 following a suicide attempt.

38.    Around age 10, Ashley began experiencing grand mal seizures. She received treatment at Lehigh Valley and Geisinger and was prescribed Keppra to manage her condition.

39.    Throughout her adolescence and adulthood, Ashley continued to experience psychiatric crises. She suffered from major depressive disorder and PTSD. She had previously attempted suicide by jumping from a building while pregnant and on another occasion by jumping from a moving car.

40.    Ashley received mental health care from facilities including Kids Peace, St. Joseph Hospital in Reading, and Reading Hospital. She also had a history of childhood sexual abuse and was diagnosed with kleptomania. She struggled with substance use, including methamphetamine.

41.    Upon information and belief, Ashley had a record of non-violent petty offenses such as retail theft. She was not serving a long sentence at the time of her incarceration at SCI Muncy.

42.    Approximately two months before her death, Ashley was transferred to SCI Muncy, operated by Defendants. Under DOC Policy DC-ADM 006 and Policy 13.08.01, SCI Muncy was required to identify inmates with psychiatric disabilities, ensure continuity of mental health care, and respond to family-reported risks related to mental illness and suicide.

8

43. Ashley's mother, Priscilla Hernandez, repeatedly contacted SCI Muncy staff to report Ashley's psychiatric history and request that she be transferred to a mental health facility. These communications constituted accommodation requests under DOC Policy DC-ADM 006 and triggered the Department's duty to evaluate and respond appropriately.

44. Despite these warnings and Ashley's known psychiatric profile, SCI Muncy placed her in the general population for the first time in her life. This violated DOC Policy 13.8.1, which requires individualized mental health assessments and continuity of care for inmates with serious mental illness.

45. Ashley was housed alone in a single cell without a cellmate or enhanced supervision, despite her known suicide risk. Upon information and belief, she was also subjected to bullying by other prisoners in general population, which further destabilized her mental condition.

46. Ashley never received a comprehensive suicide risk evaluation following her transfer to SCI Muncy, and staff did not adjust her housing or care plan to reflect her escalating distress.

47. On April 9, 2024, Ashley failed to report for recreation at 7:30 p.m. At approximately 8:32 p.m., she was found hanging in her cell by other inmates. She had no pulse.

48. On information and belief, Ashley had not been observed for over an hour prior to being found, despite DOC policies requiring that at-risk inmates be monitored at 15-minute intervals. This failure violated suicide prevention protocols under DOC Policy 13.08.01.

49. Ashley was transported to UPMC Williamsport, where she was placed on life support due to catastrophic brain injuries.

50. She remained in a vegetative state for more than a month and died on May 15, 2024.

51.     Throughout her incarceration at SCI Muncy, Ashley was denied adequate mental health care and protective supervision, despite clear signs of psychological deterioration and multiple requests for help from her mother. These failures violated DOC Policy 13.08.01, which mandates timely access to mental health services and continuity of care.

52.     Defendants failed to transfer Ashley to a psychiatric facility, failed to monitor her as required by policy and constitutional standards, and failed to protect her from foreseeable harm.

53.     Ashley's death was the direct and foreseeable result of these acts and omissions. It caused permanent harm to her family, including her two young children, who are now left without their mother.

## V.      <u>CAUSES OF ACTION</u>

### COUNT I
### Negligence
***Plaintiff v. Commonwealth of Pennsylvania, Pennsylvania Department of Corrections, Superintendent Wendy Nicholas, John Doe Correctional Officers 1–10, John Doe Medical Providers 1–5, and John Doe Mental Health Staff 1–5***

54.     Plaintiff incorporates by reference all paragraphs of this Complaint as if set forth at length.

55.     At all relevant times, Defendants were responsible for the supervision, care, custody, housing, and medical and mental health treatment of inmates in their facilities, including Ashley Hernandez.

56.     Ashley was a 25-year-old woman with a lifelong and well-documented history of severe mental illness, including depression, suicide attempts, and trauma. Her mother repeatedly warned SCI Muncy staff that Ashley required psychiatric intervention and requested that she be transferred to a mental health facility.

57.     Defendants, including correctional, supervisory, medical, and mental health staff, were all aware or should have been aware of Ashley's elevated suicide risk based on her known history and observed behaviors while incarcerated.

58.     Despite these warnings and known indicators, Defendants failed to exercise reasonable care in the supervision, evaluation, monitoring, and treatment of Ashley Hernandez. Their breaches of duty included the following specific failures, each of which independently and collectively constituted negligence:

    a.  failing to conduct thorough mental health evaluations of Ashley at intake and transfer, despite her known psychiatric history;

    b.  failing to place Ashley on suicide watch or any heightened observation, even after clear risk indicators and family alerts;

    c.  failing to house Ashley in a protective or therapeutic setting, instead isolating her in a single cell despite her vulnerability;

    d.  failing to perform required 15-minute security rounds for Ashley on the night of April 9, 2024;

    e.  failing to train staff responsible for Ashley's care to identify and respond to suicide risk and mental health deterioration;

    f.  failing to develop and implement an individualized mental health or suicide prevention plan for Ashley;

    g.  failing to act on multiple warnings from Ashley's mother requesting psychiatric care and transfer to a mental health facility;

    h.  failing to share critical mental health information about Ashley between custody and clinical staff;

    i.  failing to initiate any emergency intervention when Ashley displayed signs of psychological crisis;

    j.  failing to document or escalate Ashley's suicide risk through internal reporting mechanisms;

    k.  failing to supervise or discipline staff who neglected duties related to Ashley's safety and monitoring;

11

l.  failing to provide reasonable accommodations for Ashley's psychiatric disability, as informed by family communications;

m.  failing to convene a multidisciplinary review to reassess Ashley's placement and care in light of her condition;

n.  failing to refer Ashley for outside psychiatric care when internal resources proved inadequate;

o.  failing to track or respond to Ashley's behavioral red flags, including isolation and missed activities;

p.  failing to protect Ashley from peer bullying, despite knowledge of her emotional and psychological fragility;

q.  failing to review or respond to complaints, sick calls, or other signs of escalating risk in Ashley's records;

r.  failing to assign sufficient or trained staff to Ashley's housing unit during high-risk hours;

s.  failing to audit staff compliance with suicide prevention policies in Ashley's unit;

t.  failing to outfit Ashley's cell with suicide-resistant features or equipment;

u.  failing to implement changes after prior suicide incidents involving circumstances similar to Ashley's;

v.  failing to evaluate Ashley for trauma-related needs during classification and mental health screening;

w.  failing to use watch logs or other tools to track Ashley's risk status and care needs; and

x.  failing to escalate urgent concerns from Ashley's family to supervisors or medical leadership.

59.  These failures were not isolated oversights but instead reflect a pattern of gross negligence and reckless disregard for Ashley's life, in violation of clear institutional policies, professional standards, and constitutional obligations.

60.  Defendants failed to implement or enforce policies concerning the identification, supervision, and treatment of mentally ill inmates. They failed to ensure that their employees were

12

trained, equipped, or supervised to respond to inmates in crisis. These failures occurred despite the Department's awareness of prior suicides and repeated warnings about systemic deficiencies in the mental health care provided to incarcerated individuals.

61.    As a result of Defendants' negligent and grossly negligent acts and omissions, Ashley was left unsupervised in a solitary cell despite known risk factors. She was found hanging on April 9, 2024, and later died on May 15, 2024, after being kept on life support.

62.    Defendants' acts and omissions directly and foreseeably led to Ashley's prolonged suffering, catastrophic injury, and death.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, awarding all damages recoverable under applicable law, including compensatory damages, wrongful death and survival damages, punitive damages where permitted, pre- and post-judgment interest, costs of suit, attorneys' fees where authorized, and such other relief as this Court deems just and proper.

**COUNT II**
**Violation of 42 U.S.C. § 1983 – – Deliberate Indifference to a Serious Medical Need and Failure to Protect from Known Risk of Suicide ((Direct Liability)**
***Plaintiff v. John Doe Correctional Officers 1–10, John Doe Mental Health Staff 1–5,***
***John Doe Medical Providers 1–5, and Superintendent Wendy Nicholas***

63.    Plaintiff incorporates by reference all paragraphs of this Complaint as if set forth at length.

64.    John Doe Correctional Officers 1–10, John Doe Mental Health Staff 1–5, John Doe Medical Providers 1–5, and Superintendent Wendy Nicholas were acting under color of state law and held direct or supervisory responsibility for Ashley Hernandez's care, mental health treatment, housing, and safety during her incarceration at SCI Muncy.

65.    Ashley had a well-documented history of serious mental illness, including major depressive disorder, PTSD, and seizure disorder, and had engaged in multiple prior suicide attempts.

66.    SCI Muncy staff were aware of Ashley's psychiatric and neurological history. Her mother, Priscilla Hernandez, made multiple calls to the facility, warning staff of Ashley's suicide risk and requesting that she be transferred to a mental health facility.

67.    Despite these warnings and Ashley's visible deterioration, Defendants failed to conduct appropriate mental health assessments, failed to initiate suicide prevention protocols, and failed to place Ashley under enhanced observation.

68.    Defendants placed Ashley in general population and housed her alone in a single cell, despite her documented history of mental illness and suicide attempts. This placement violated established DOC procedures requiring protective housing, Z-Code evaluation, and mental health screening for individuals identified as vulnerable or high-risk. Upon information and belief, Ashley was being bullied by other inmates and displayed escalating signs of psychological distress, which were not addressed through clinical intervention or housing reassessment.

69.    On April 9, 2024, Ashley failed to report for recreation. She was discovered hanging in her cell at approximately 8:32 p.m. She had not been checked for over an hour, despite suicide prevention policies requiring observation at 15-minute intervals.

70.    Defendants failed to provide any meaningful mental health intervention. They ignored clear signs of a psychiatric crisis and did nothing to mitigate the risk of self-harm, despite having actual knowledge of that risk and access to policies, training, and tools designed to prevent such outcomes.

14

71.    Ashley was transported to UPMC Williamsport with catastrophic brain injuries and placed on life support. She remained in a vegetative state until her death on May 15, 2024.

72.    The conduct of Defendants constituted deliberate indifference to Ashley's serious medical and mental health needs. Defendants failed to evaluate her condition, implement suicide prevention measures, conduct the required 15-minute security rounds, and initiate any psychiatric intervention. These failures violated clearly established obligations under DOC policies, including Reception and Classification (Policy 11.02.01), Access to Mental Health Care (Policy 13.08.01), and Accommodations for Inmates with Disabilities (DC-ADM 006), as well as her rights under the Eighth and Fourteenth Amendments to the United States Constitution.

73.    As a direct and proximate result of these violations, Ashley suffered extreme pain and suffering, emotional distress, and ultimately death.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, awarding all damages recoverable under applicable law, including compensatory damages, wrongful death and survival damages, punitive damages where permitted, pre- and post-judgment interest, costs of suit, attorneys' fees where authorized, and such other relief as this Court deems just and proper.

**COUNT III**
**Violation of 42 U.S.C. § 1983 – Supervisory Liability for Deliberate Indifference**
*__Plaintiff v. Superintendent Wendy Nicholas and John Doe Supervisory Officials__*

74.    Plaintiff incorporates by reference all paragraphs of this Complaint as if set forth at length.

75.    At all relevant times, Superintendent Wendy Nicholas and John Doe Supervisory Officials (collectively "Supervisory Defendants") at SCI Muncy were acting under color of state law in the scope of their employment with the Pennsylvania Department of Corrections.

15

76. These Defendants were responsible for establishing and enforcing policies, training protocols, and supervisory practices related to inmate safety, suicide prevention, and mental health care. Their duties included ensuring that subordinate staff were properly equipped, monitored, and disciplined, and for ensuring compliance with DOC policies governing suicide prevention and mental health care, including Policies 11.02.01, 13.08.01, and DC-ADM 006.

77. Supervisory Defendants had actual knowledge of Ashley Hernandez's severe mental illness, history of suicide attempts, neurological conditions, and trauma. They were responsible for reviewing or acting upon serious mental health alerts, classification risk factors, and outside communications from family members, including multiple warnings from Ashley's mother requesting psychiatric intervention and transfer to a mental health facility.

78. Despite this knowledge, Supervisory Defendants failed to implement or enforce suicide prevention protocols for Ashley. They failed to ensure that her documented needs and her mother's warnings were addressed through protective housing, medical intervention, or crisis response procedures.

79. Supervisory Defendants knowingly allowed Ashley to be housed alone in general population without increased monitoring, despite her elevated suicide risk. They failed to enforce the 15-minute round policy, even though Ashley's condition triggered the very risks the policy was designed to prevent.

80. They also failed to train, supervise, or discipline subordinate correctional, medical, and mental health staff in how to recognize and respond to suicidal ideation, psychiatric decline, or trauma-related indicators in high-risk inmates like Ashley.

81. These supervisory failures were not isolated oversights but part of a broader pattern of systemic disregard for the safety of mentally ill inmates. They reflect a deliberate choice not to act on known information, contrary to well-established constitutional obligations.

82. As a direct and foreseeable result of these failures, Ashley Hernandez was left in a high-risk setting without appropriate monitoring or care. She was found hanging in her cell on April 9, 2024, and died weeks later from her injuries.

83. The conduct of Superintendent Wendy Nicholas and the John Doe Supervisory Officials amounted to deliberate indifference under the Eighth and Fourteenth Amendments, in violation of Ashley's clearly established constitutional rights.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, awarding all damages recoverable under applicable law, including compensatory damages, wrongful death and survival damages, punitive damages where permitted, pre- and post-judgment interest, costs of suit, attorneys' fees where authorized, and such other relief as this Court deems just and proper.

## VI.    DAMAGES

### A.    Wrongful Death Action

84. Plaintiff incorporates by reference all paragraphs of this Complaint as if set forth at length.

85. This action is brought on behalf of all persons entitled to recover damages for the death of Ashley Virginia Hernandez, deceased, pursuant to the Pennsylvania Wrongful Death Act, 42 Pa.C.S.A. § 8301.

86. The wrongful death beneficiaries of Ashley Virginia Hernandez include her two minor children:

17

| Name | Relationship | Address |
|------|--------------|---------|
| P.J.H.L. | Son | 402 Main Street, Pottsville, PA 17901 |
| C.M.H. | Son | 402 Main Street, Pottsville, PA 17901 |

87.     Ashley Hernandez did not bring any claim for the matters set forth in this Complaint during her lifetime.

88.     Plaintiff Anthony Michael Lee, as Administrator of the Estate, claims all lawful damages for all persons entitled by law to recover such damages, including but not limited to medical and hospital expenses, funeral and burial expenses, expenses of administration, loss of support and services, loss of the decedent's care, companionship, comfort, guidance, and tutelage, and emotional and psychological loss sustained by the wrongful death beneficiaries as a result of Ashley's death.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, awarding all damages recoverable under applicable law, including compensatory damages, wrongful death and survival damages, punitive damages where permitted, pre- and post-judgment interest, costs of suit, attorneys' fees where authorized, and such other relief as this Court deems just and proper.

**B.    Survival Action**

89.     Plaintiff incorporates by reference all paragraphs of this Complaint as if set forth at length.

90.     Plaintiff brings this action on behalf of the Estate of Ashley Virginia Hernandez, deceased, pursuant to the Pennsylvania Survival Act, 42 Pa.C.S.A. § 8302, and claims on behalf of the Estate all damages recoverable by law, including but not limited to: Ashley's pre-death

physical pain, emotional suffering, mental anguish, lost earning capacity, loss of enjoyment of life, and the total deprivation of her normal activities and life's pleasures.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, awarding all damages recoverable under applicable law, including compensatory damages, wrongful death and survival damages, punitive damages where permitted, pre- and post-judgment interest, costs of suit, attorneys' fees where authorized, and such other relief as this Court deems just and proper.

Respectfully submitted,

FELDMAN SHEPHERD WOHLGELERNTER
TANNER WEINSTOCK & DODIG, LLP

Mark W. Tanner, Esq.
Bethany R. Nikitenko, Esq.
Samuel Mukiibi, Esq.
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
Tel: (215) 567-8300
Fax: (215) 567-8333
mtanner@feldmanshepherd.com
bnikitenko@feldmanshepherd.com
smukiibi@feldmanshepherd.com

*Attorneys for Plaintiff*

Date: January 16, 2026

19